# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Cathy Renee Gallo, | | |
| Plaintiff, | | No.18-cv-928 |
| v. | | (Judge Jones) |
| Nancy A. Berryhill,<br>Acting Commissioner of<br>Social Security, | | |
| Defendant. | | |

## MEMORANDUM

### February 15, 2019

### I. Procedural Background.

We consider here the appeal of Plaintiff Cathy Gallo from an adverse decision of the Social Security Administration ("SSA" or "Agency") on her application for disability insurance benefits. Plaintiff's claim was initially denied at the administrative level on March 26, 2015. Plaintiff then requested a hearing before an administrative law judge (ALJ) and received a hearing on January 17, 2017. On April 17, 2017, ALJ Susan L. Torres issued a written decision (Doc. 8-2 at 12-31) that denied benefits. Plaintiff requested review from the Appeals Council but was unsuccessful. (Doc. 8-2 at 2-6). The Appeals Council's denial of Plaintiff's

request for review is a final decision of the Agency that vests this Court with jurisdiction over this matter pursuant to 42 U.S.C. § 405g.

## II. Testimony before the ALJ.

ALJ Torres conducted a hearing in this matter on January 17, 2017. Plaintiff was present along with her attorney and Mr. Bierley, a vocational expert. Their testimony may be summarized as follows.

Plaintiff testified that she last worked in 2010 as an employee of Giant Foods. She stopped working at that time due to a work injury for which she received workman's compensation benefits. She currently has no income. She rents an apartment but must rely on her daughter to provide money to defray her living expenses and prescriptions. She is currently five months behind in her rent and had previously signed her car over to her landlord in lieu of rent. (R. 42-43).

Her work at Giant Foods was in the floral department. At one point she took a job at Home Depot to make more money. She returned to Giant Foods after one year because the insurance benefit was superior to that provided by Home Depot. Her work involved caring for plants and assisting customers. (R. 43-44).

Plaintiff's treating physicians are Dr. Albano-Aluquin, a rheumatologist, and Dr. Vonah, her personal physician. Dr. Albano-Aluquin treats Plaintiff's rheumatoid arthritis. Plaintiff takes methotrexate and folic acid to alleviate symptoms related to her rheumatoid arthritis. Dr. Vonah has prescribed morphine

sulfate and Percocet for pain and a steroidal medication for a skin condition characterized by chronic itching. The medications for her skin condition are in pill form and she also uses a steroid cream. She takes the Percocet three times daily and the morphine sulfate twice daily. These medications produce side effects in the form of dizziness, fatigue, and nausea. (R. 44-46).

Plaintiff experiences most of her pain in her hands, feet, knees, and hips and also experiences flare-ups in the back of her neck. The pain in her feet has caused her toes to curl and this makes walking difficult. The pain in her feet is a sharp, stabbing pain. She finds that if she elevates her feet the pain diminishes to a dull throb. Her knuckles swell and this produces a burning sensation in her hands. The pain in her feet is constant while the pain in her hands is worse at night but improves somewhat during the day. If she sits too long the pain in her hips worsens and forces her to get up. The hip pain also makes it difficult for her to lay flat in bed. Her hip pain is of a throbbing variety. The neck pain is present mostly at night and is located at the base of her neck. The neck pain does not radiate. (R. 46-48).

Plaintiff has had carpal tunnel surgery but was unsure which hand was affected. She is right hand dominant and is "pretty sure" the carpal tunnel release was performed on her right hand. She stated that the surgery had not been helpful and that she continues to experience swelling, pain, and throbbing. She buys only

slip on shoes and needs help with buttons as a result of her carpal tunnel syndrome. She cannot remove cellophane from an object wrapped with that substance because she cannot pinch effectively. (R. 48-49).

Her skin condition is a form of dermatitis which sometimes produces open sores. These sometimes bleed and her daughter has to help her bandage them. Getting her hands wet exacerbates the dermatitis and aggravates the sores. As a result, she showers only twice each week. A friend who is a nursing assistant checks her hands once each week and applies an antibiotic cream on any sores that are festering. (R. 48-50).

Plaintiff is not able to sleep through the night due to the fact that being supine for more than half an hour produces headaches. Her hip pain also complicates her sleep. She spends most of the night in a chair. She sleeps approximately two hours each night. As a result, she is typically fatigued during the day and takes four to five short naps on average. (R. 50-51).

Plaintiff also experiences migraine headaches about four times each week. She takes Imitrex for her migraines. The Imitrex alleviates the pain but it typically takes about four hours to eliminate the pain. The migraines begin with an aura in her vision and produce nausea, vomiting, and sharp pain above her right eye. During these episodes she must get to a dark place and cannot tolerate any noise.

On occasion her migraines can last up to twenty hours. On these occasions she will go to an emergency room for medical assistance. (R. 51-54).

Plaintiff stated that she has difficultly walking and does not even do her own grocery shopping. She has trouble walking even as far as to her mailbox and back. She can stand for approximately fifteen minutes but then her feet are in such pain that she must sit down. She can sit in one place for an hour to an hour and one half but must then get up because her hips begin to ache. She can lift approximately five pounds and is able to dress herself and bathe herself only with assistance from her daughter. Plaintiff also related that she experiences panic attacks "a couple of times a week". The panic attacks produce shortness of breath and dizziness. They can last for as long as two hours. Whenever she knows that she has to deal with something that takes her out of her normal routine such as a doctor's appointment or the arrival of company she is likely to experience a panic attack. (R. 54-55).

She testified further that she has had several surgeries for thoracic outlet syndrome and she is concerned that she may need another such surgery. She is also having issues with her vision due to a malfunction of her tear ducts. Her tear ducts clog and this produces intense pain and impairs her vision at times. She takes prescription eye drops for this condition and her doctor wants her to have a test of some sort when she next experiences a flare up of this condition. (R. 55-56).

Plaintiff travels to her grandparents' home on the shore in North Carolina on occasion when her dermatitis is aggravated. Her grandparents take her to their beach home in North Carolina because she can get extra sunlight. Extra sunlight has the effect of blunting her skin symptoms. Her grandparents drive and the trip, which should take eight hours, typically takes twelve hours because she must stop frequently. Plaintiff no longer drives herself and goes places only as a passenger. Driving aggravates her leg pain and being out of the house can produce a panic attack. She does not clean or cook. Her daughter and a friend do all her cleaning and cooking for her. She reads during the day when she feels up to it and watches the news on television at night. She formerly painted as a hobby but can no longer do so. (R. 57-59).

Also testifying was Mr. Bierley, a VE. He stated that his testimony would be consistent with the Dictionary of Occupational Titles unless he stated otherwise. Plaintiff's attorney did not object to the VE's qualifications. Mr. Bierley described Plaintiff's past relevant work as that of a "floral sales person". He stated that Plaintiff's work had been semi-skilled and, though classified as light exertional level, it was typically performed at medium exertional level. (R. 59-60).

The ALJ asked Mr. Bierley a hypothetical question in which he was to assume a person of Plaintiff's age, education, and work experience with the residual functional capacity ("RFC") to perform light work with limitations

including: only occasional climbing of ramps and stairs; never climbing on ladders, ropes, or scaffolds; only occasional stooping, kneeling, crouching, or crawling; only occasional reaching overhead with the upper extremities; avoidance of exposure to extreme cold, loud noise, vibration, and hazards such as heights and moving machinery; and the ability to remember and carry out only simple instructions. (R. at 60).

Based upon the profile presented by the ALJ's hypothetical question, the VE stated that the hypothetical person could not perform Plaintiff's past relevant work. However, the VE testified that other jobs (e.g. "small products assembler", "electrical accessories assembler", and "machine feeder") existed in significant numbers in the national economy that the hypothetical person could perform. When asked whether the hypothetical person could perform sedentary work with the same limitations as in the first hypothetical question, the VE stated that the hypothetical person could not do Plaintiff's past relevant work but could perform such jobs as "final assembler", "inspector", and "table worker", all of which exist in significant numbers in the national economy. (R. at 61).

The ALJ then asked a third hypothetical question in which the assumptions about age, education, and work experience remained the same but the limitations included: sitting no more that two hours per day and standing/walking no more two hours per day; the need to change positions every thirty minutes; the need to take

unscheduled breaks more that five times per day for five to ten minutes at a time; only occasional lifting or carrying up to ten pounds and rarely lifting or carrying up to twenty pounds; and only occasional twisting of the head to look left or right and occasional stooping, crouching, and climbing on ladders or stairs. Confronted with this hypothetical question, the VE stated that the hypothetical person could not perform any work of any sort. The VE responded also that, assuming a person would consistently miss three or more days of work each month, such a person would be unemployable. The VE stated that his opinion on issues such as the number of breaks, changing positions, and absenteeism was based on his thirty years of experience and his review of professional periodicals.

### III.    Relevant Medical Evidence.

### 1.  Doctor William R. Vonah, MD.

Dr. Vonah treated Plaintiff from December 2013 through at least September of 2016. The record indicates that he saw Plaintiff no fewer that sixteen times during that period. Dr. Vonah continually assessed Plaintiff to be suffering from chronic problems including: migraine headaches, depression, brachial plexus lesions, status post thoracic outlet syndrome, rheumatoid arthritis, chronic

dermatitis accompanied by skin eruptions, and, by May of 2015, chronic pain syndrome. [1]

Over the course of his treatment of Plaintiff, Dr. Vonah prescribed a variety of pain medications including Percoset and morphine sulfate. He prescribed Imitrex and Toradol for Plaintiff's migraine headaches. Lexapro was prescribed for Plaintiff's depressive symptoms and Klonopin was prescribed for her anxiety. Various steroid creams and antihistamines were prescribed for Plaintiff's skin lesions. In January of 2015 Dr. Vonah referred Plaintiff to Dr. Shirley Albano-Aluquin for a rheumatology evaluation.

### 2. Dr. Shirley Albano-Aluquin.

Dr. Albano-Aluquin is a rheumatologist employed with the Milton S. Hershey Medical Center. She had first seen Plaintiff in 2007 but did not see her again until Dr. Vonah's referral in 2015. Dr. Albano-Aluquin first saw Plaintiff in June of 2007 "for a blistery rash over the wrists and ankles which eventually

---

[1] According to the Mayo Clinic Website, "the brachial plexus is the network of nerves that send signals from your spinal cord to your shoulder, arm, and hand. Brachial plexus injury is a result of trauma which, in serious cases, can impair the ability to use the affected arm severely. Some brachial plexus injuries can cause chronic problems including pain and numbness." www.mayoclinic.org/diseases/bracialplexusinjury. "Thoracic outlet syndrome is a group of disorders that occur when blood vessels or nerves in the space between your collar bone and your first rib (thoracic outlet) are compressed. This can cause pain in your shoulders and neck and numbness in your fingers. … doctors recommend surgery to treat thoracic outlet syndrome only when other treatments had not been effective. Surgery has higher risks than do other treatments and may not always treat your symptoms." www.mayoclinic.org/diseases/thoracicoutletsyndrome.

spread to the knees and elbows accompanied by joint pain." (R. 355). During the relevant time period, Dr. Albano-Aluquin saw Plaintiff on four occasions: February 2, 2015; June 4, 2015; August 18, 2015; and January 6, 2016.

On February 2, 2015, Dr. Albano-Aluquin assessed "chronic severe mixed pain, fluctuating from moderate to severe, notable after shoulder injury back in 2009, status post multiple surgeries for thoracic outlet syndrome with mild improvement of pain, history of carpal tunnel surgery for wrist pain, and persistent mixed pain from joint, myofascial and neuropathic structures." Dr. Albano-Aluquin started Plaintiff on Plaquenil in the hope that it "might help the inflammatory component of her neuropathic, myofascial, and joint pains." Dr. Albano-Aluquin also noted that Plaintiff had previously tried multiple neuropathic pain medications (including Lyrica and Cymbalta) without relief but with side effects. (R. 357).

On June 4, 2015, Dr. Albano-Aluquin assessed that Plaintiff suffered from inflammatory arthritis and myofascial and neuropathic pain. She noted that Plaintiff "has not benefited from her four month trial of Plaquenil" and that she was going to prescribe Methoprexate on a trial basis. (R. 350).

On August 18, 2015, Dr. Albano-Aluquin assessed that Plaintiff continued to manifest "chronic mixed pain from a combination of severe neuropathic pain, myofascial pain, and osteoarthritis with inflammatory arthritis, with mild positive

rheumatoid factor which can be consistent with mixed inflammatory arthritis including rheumatoid arthritis." Dr. Albano-Aluquin noted that Plaintiff had been unable to tolerate doses of oral Methotrexate and had switched Plaintiff to subcutaneous injections. Dr. Albano-Aluquin also noted that: "Her pains persist and fluctuate from moderate to severe impacting activities and quality of life. The worst are over the legs, back, and feet, with some swelling of the toes." (R. 335-336).

On January 6, 2016, Dr. Albano-Aluquin continued to assess chronic mixed pain from inflammatory arthritis with severe myofascial and neuropathic pain. She continued Plaintiff on the medications and injections she had previously prescribed. (R. 329).

On January 12, 2017, Dr. Albano-Aluquin completed a Physical Residual Functional Capacity Questionnaire regarding Plaintiff. She noted that she had been seeing Plaintiff twice each year and that she diagnosed Plaintiff to be afflicted by inflammatory arthritis and chronic pain. Plaintiff's prognosis was described as "poor". Dr. Albano-Aluquin stated that her diagnosis and assessment were supported by clinical findings and objective signs including joint tenderness and tender points on exam. Dr. Albano-Aluquin indicated that Plaintiff's impairments had lasted more that twelve months and that they were consistent with symptoms

and functional limitations described in her evaluation. Dr. Albano-Aluquin indicated that Plaintiff was not a malinger. (R. 581-582).

Dr. Albano-Aluquin assessed that Plaintiff's pain and other symptoms would constantly interfere with the attention and concentration needed to perform even simple work tasks and that she was incapable of performing even "low stress" jobs. In terms of her physical capacities, Dr. Albano-Aluquin estimated that Plaintiff could: sit and stand for no more than twenty to thirty minutes at a time and sit and stand for less than a total of four hours in an eight hour work day; rarely carry or lift twenty pounds and occasionally carry or lift up to ten pounds; occasionally look up or down and right or left; occasionally twist, stoop, couch, or climb on stairs or ladders; and engage in grasping or twisting of objects or reaching with her arms for no more that thirty percent of an eight hour workday. Dr. Albano-Aluquin estimated that Plaintiff would require more than five unscheduled breaks of five to ten minutes duration during an eight hour workday. Finally, Dr. Albano-Aluquin opined that the symptoms she identified would cause Plaintiff to miss more than four days from work per month. (R. 583-584).

## IV.    The ALJ Decision.

The ALJ's Notice of Decision dated April 17, 2017 (R. at 12-31) was unfavorable to the claimant and included the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security act on December 31, 2015.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of August 15, 2013 through her date last insured of December 31, 2015.

3. Through the date last insured, the Plaintiff had the following severe impairments: inflammatory arthritis, history of thoracic outlet syndrome, history of right carpal tunnel syndrome, degenerative disc disease of the cervical and lumbar spine, migraine headache, eosinophilic dermatitis, depressive disorder, and anxiety disorder.

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equal the severity of one of the listed impairments in 20 C.F.R, part 404, sub. part B, App'x 1 (20 C.F.R. 404. 520(d), and 404.1525 and 404.1526).

5. After careful consideration of the entire record the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 C.F.R 404.1567 (a) except:

occasionally climb ramps or stairs, but never climb ladders, ropes, or scaffolds; occasionally stoop, kneel, crouch, and crawl; occasionally reach overhead with the bilateral upper extremities; avoid concentrated exposure to extreme cold, loud noise, vibration, and workplace hazards such as heights and moving machinery on the ground like forklifts; and can understand, remember, and carry out simple instructions.

6. Through the date last insured, the claimant was unable to perform any past relevant work.

7. The claimant was born on May 25, 1967 and was forty-eight years old, which is defined as a younger individual, on the date last insured.

8. The claimant has a limited education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills.

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed.

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from August 15, 2013, the alleged onset date, through December 31, 2015, the date last insured.

## V.  Disability Determination Process.

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[2]  It is necessary for the Commissioner to ascertain:

_____

[2]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work. 20 CFR §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

The disability determination involves shifting burdens of proof. The initial burden rests with the claimant to demonstrate that he is unable to engage in his past relevant work. If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (Doc. 8-2 at 25).

## VI.    Standard of Review.

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's

decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).

Substantial evidence means "more than a mere scintilla".  It means "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."

*Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642

F.2d 700, 704 (3d Cir. 1981).  The United States Court of Appeals for the Third

Circuit further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir.

1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence––particularly certain types of evidence (e.g., that offered by treating physicians)––or if it really constitutes not evidence but mere conclusion.  *See Cotter*, 642 F.2d at 706 ("Substantial evidence" can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

710 F.2d at 114.

This guidance makes clear that it is necessary for the Secretary to analyze

all evidence.  If she has not done so and has not sufficiently explained the weight

given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, our Court of Appeals clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "There is no requirement that the ALJ discuss in her opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v.*

*Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.")). Finally, an ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## VII.  Discussion

### A.  General Considerations

At the outset of this Court's review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, I note that the Third Circuit has repeatedly emphasized the special nature of proceedings for

disability benefits.  *See Dobrowolsky*, 606 F.2d at 406.  Social Security

proceedings are not strictly adversarial; rather the Social Security Administration

provides an applicant with assistance to prove his claim.  *Id.*  "These proceedings

are extremely important to the claimants, who are in real need in most instances

and who claim not charity but that which is rightfully due as provided for in

Chapter 7, Subchapter II, of the Social Security Act."  *Hess v. Secretary of Health,*

*Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974).  As such, the agency

must take extra care in developing an administrative record and in explicitly

weighing all evidence.  *Dobrowolsky*, 606 F.2d at 406.  Further, the court in

*Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative

purpose, courts have mandated that leniency be shown in establishing the

claimant's disability, and that the Secretary's responsibility to rebut it be strictly

construed."  *Id.*

**B.  Plaintiff's Allegations of Error**.

Plaintiff has identified two alleged errors which require remand or reversal

of the Agency's decision. We shall consider these in the order presented.

**1. Whether the ALJ's RFC assessment adequately reflects the Plaintiff's**

**difficulties with concentration, persistence, and pace?**

As Plaintiff asserts, the ALJ determined that she has moderate difficulties in

maintaining concentration, persistence and pace. The Government argues "there is

no per se rule that a moderate degree of limitation in a paragraph B criteria automatically triggers findings of a particular work-related restriction; that is a matter that depends upon the record before the ALJ and his analysis of it." (Doc. 10 at 11). The Court does not quarrel with this assertion by the Government.

The Government then points to the ALJ's observation that she was "generous" in limiting Plaintiff to simple instructions due to the fact that Plaintiff's treatment records did not support serious mental health deficits. *Id.* The ALJ's analysis on this point misses the mark. Dr. Albano-Aluquin's assessment that Plaintiff was limited in concentration, persistence, and pace was not predicated on a finding of serious mental health problems. Rather, the assessment was based on Dr. Albano-Aluquin's opinion that Plaintiff's physical pain would interfere with her ability to maintain concentration, persistence and pace. (R. at 582). Thus, the ALJ's conclusion that mental deficiencies did not preclude Plaintiff from performing occupations requiring only the ability to understand, remember, and carryout simple instructions does not address the cause of Plaintiff's limitations (her level of physical pain) as determined by a medical expert. This is a fatal flaw in the ALJ's analysis because, as Plaintiff argues, limiting a claimant to the performance of simple, repetitive tasks does not adequately account for moderate restrictions in concentration, persistence, or pace. See, e.g. *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987); *Barry v. Astrue*, 2007 WL 2022085 at 4

(E.D.Pa. July 9, 2007; *Steininger v. Barnhart*, 2005 WL 2077375) E.D.Pa. July 9, 2007). See also, *Mascio v. Colvin* 780 F.3d 632, 638 (4d Cir. 2015).

Given the fact that the ALJ acknowledged Plaintiff's moderate difficulty with concentration, persistence, and pace, each of the hypothetical questions phrased to the vocational expert used an assumed RFC that did not adequately reflect all the Plaintiff's limitations as required by the law of the Third Circuit Court of Appeals. A hypothetical question to a vocational expert must reflect all of a claimant's impairments. *Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002). Because the ALJ's hypothetical questions to the vocational expert did not do so, Plaintiff's assignment of error on this point must be credited.

## 2. Whether the ALJ properly evaluated the opinion of Dr. Albano-Aluquin?

The ALJ assigned only limited weight to Dr. Albano-Aluquin's assessment of Plaintiff's medical impairments. This assessment included Dr. Albano-Aluquin's findings: that Plaintiff was incapable of performing even low stress jobs; that Plaintiff's physical impairments affected her ability to concentrate; that Plaintiff would miss work more that four days each month; and that Plaintiff would require five or more unscheduled breaks of five to ten minutes duration in each eight hour workday. Under applicable regulations and the law of the Third Circuit Court of Appeals, a treating medical source's opinions are generally entitled to

controlling weight, or at least substantial weight. See, e.g., *Fargnoli v. Heckler*, 247 F.3d 34, 43 (3d. Cir. 2001) (citing 20 C.F.R. § 404.1527(c)(2); and *Cotter v. Harris* 642 F.2d 700, 704 (3d Cir. 1981). Sometimes called the "treating physician rule), this principle is codified for cases, like the instant case, filed before March 27, 2017 at 20 C.F.R. 404.15279(c)(2). It is widely accepted in the Third Circuit. *Mason v. Shalala,* 994 F.2d 1058 (3d Cir. 1993). The regulation addresses the weight to be given to a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).

A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d. Cir. 2000) (citations admitted); see also *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d. Cir. 2008).

Nevertheless, relevant authority makes clear that a treating physician's opinion is not always or automatically entitled to controlling weight. While the general principle that an ALJ need not cite every piece of relevant evidence in the

record applies in the treating physician opinion context, the ALJ must adequately explain the reasons for rejecting a treating physician's opinion. *Fargnoli, supra*, at 42; see also *Sykes v. Apfel*, 228 F.3d 259, 266n.9 (3d. Cir. 2009). In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation, or lay opinion." *Morales*, supra, at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). "Lay reinterpretation of medical evidence does not constitute 'inconsistent substantial evidence.'" *Carver v. Colvin*, 216 WL 6601665 at *16 (M.D.Pa. September 14, 2016). Thus, a reviewing court must disregard medical evidence cited as contradictory if it is, in fact, merely lay reinterpretation or judgment rather than a finding by a qualified medical professional.

The fundamental problem here is that the ALJ did not rely on contradictory medical evidence. Indeed, the ALJ referenced no medical evidence other than that provided by plaintiff's treating physicians, Dr. Vonah and Albano-Aluquin. These physicians consistently made reference to Plaintiff's chronic pain over a period of more than three years. When a claimant testifies, as here, to the limiting effects of pain stemming from established impairments of record, such complaints should not be discounted without credible contrary medical evidence, *Skyes v. Apel*, 228 F.3d

259, 266 (3d Cir. 2000); see also *Green v. Schweiker*, 749 F.2d 1066, 1068 (3d Cir. 1984). Significantly, the ALJ's decision to assign little weight to Dr. Albano-Aluquin's Medical Source Statement is absolutely unsupported by any contradictory medical evidence. Rather, the ALJ's rejection of Dr. Albano-Aluquin's assessment of Plaintiff's physical limitations is founded upon precisely the sort of "credibility judgments, speculation, or lay opinion" found wanting in Morales, supra. Consequently, the Plaintiff's assignment of error on this point must also be credited.

## VIII. Conclusion.

For the reasons stated above, this case will be remanded to the Agency for further consideration to include an expansion of the record to obtain an assessment of Plaintiff's residual functional capacity by a consulting/examining physician and such other proceedings as the Agency deems necessary. An Order to this effect will be issued.